**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| Kenny, et al., | ) | Civil Action No. 2:16-cv-2794-MBS |
| | ) | |
| | ) | |
| Plaintiffs, | ) | **OPINION AND ORDER** |
| v. | ) | |
| | ) | |
| Wilson, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

This matter is before the court on the motion for summary judgment filed by Plaintiffs

Niya Kenny; Taurean Nesmith; Girls Rock Charleston, Inc.; D.S., by and through her next of kin

Juanita Ford; S.P., by and through her next of kin Melissa Downs, and D.D., by and through his

next of kin, Temika Hemmingway (collectively, "Plaintiffs") on behalf of themselves and those

similarly situated.  ECF No. 216.  Also before the court is the motion for summary judgment

filed by Defendant Alan Wilson, in his official capacity as Attorney General of South Carolina,

("Defendant").  ECF No. 215.[1]

---

[1] Pursuant to a consent motion, the court stayed this action as to Defendants J. Alton Cannon, Jr., in his official capacity as the Sheriff of Charleston County, South Carolina, Luther T. Reynolds, in his official capacity as the Chief of the Charleston City Police Department, Reginald L. Burgess, in his official capacity as the Chief of the North Charleston City Police Department, Carl Ritchie, in his official capacity as the Chief of the Mt. Pleasant City Police Department, Leon Lott, in his official capacity as the Sheriff of Richland County, South Carolina, W.H. Holbrook, in his official capacity as the Chief of the Columbia City Police Department, Johnny Mack Brown, in his official capacity as the Interim Sheriff of Greenville County, South Carolina, Ken Miller, in his official capacity as the Chief of the Greenville City Police Department, Lance Crowe, in his official capacity as the Chief of the Travelers Rest City Police Department, M. Bryan Turner, in his official capacity as the Chief of the Mauldin City Police Department, Dan Reynolds, in his official capacity as the Chief of the Greer City Police Department, A. Keith Morton, in his official capacity as the Chief of the Fountain Inn City Police Department, and Michael D. Hanshaw, in his official capacity as the Chief of the Simpsonville City Police Department ("Law Enforcement Defendants").  ECF No. 131.

# BACKGROUND

## Factual Background

Plaintiffs Kenny, Nesmith, D.S., S.P., and D.D. are or were enrolled in the South Carolina public school system. Plaintiff Girls Rock Charleston, Inc. ("Girls Rock") is a nonprofit organization "whose members are directly impacted by and face ongoing risk of arrest or referral under S.C. Code § 16-17-420."[2] ECF No. 157 at ¶ 10. Together, Plaintiffs asserted a challenge pursuant to 42 U.S.C. § 1983 that the Disturbing Schools Law, codified at S.C. Code Ann. § 16-17-420, is unconstitutional on its face and the Disorderly Conduct Law, codified at S.C. Code Ann. § 16-17-530, is unconstitutional as applied to children in public school grades K-12. Plaintiffs filed an amended complaint on May 16, 2019, at which time they sought: 1) a declaratory judgment stating that the Disturbing Schools and Disorderly Conduct Laws violate the Fourteenth Amendment; 2) a preliminary and permanent injunction enjoining Defendant from enforcing both statutes; and 3) an order enjoining Defendant from considering and/or retaining records of individuals prosecuted or charged under the Disturbing Schools and Disorderly Conduct Laws, "except as would be permissible following expungement . . . ." ECF No. 157 at 25-26.

Notably, the South Carolina Legislature amended the Disturbing Schools Law on May 17, 2018. ECF No. 132-1. The Disturbing Schools Law in its current form applies only to non-students. Plaintiffs concede that the amendment addresses their request "that this Court enjoin enforcement of S.C. Code § 16-17-420 . . . and also resolve[s] the [enforcement] claims of Niya

---

[2] Since the filing of the suit, the organization changed its name to the Carolina Youth Action Project. ECF No. 133. The court will refer to the organization as "Girls Rock," as that is the name used in the complaint.

Kenny and Taurean Nesmith . . .," but assert that "the legislative amendments did not address Plaintiffs' request for relief from the retention of records related to . . . the Disturbing Schools Law or Plaintiffs' claims related to the Disorderly Conduct statute." ECF No. 167 at 3.  In other words, Plaintiffs do not challenge the Disturbing Schools Law in its current form.  However, they maintain the claim that the Disturbing Schools Law in its former iteration is unconstitutionally vague and, on that basis, they seek relief enjoining Defendant from considering and/or retaining records of individuals prosecuted or charged under the former Disturbing Schools Law.  Plaintiffs' claims and requested remedies are otherwise unchanged.

On February 19, 2019, Plaintiffs moved to amend their complaint to add D.D., a then-current South Carolina public school student charged under the Disturbing Schools Law, as a class representative.  The court granted leave to amend, and Plaintiffs filed an amended complaint adding D.D. as a Plaintiff on May 16, 2019. ECF No. 157.  The original complaint was otherwise unchanged.

<u>Procedural History</u>

This case was reassigned to the undersigned on April 6, 2018, following remand from the Fourth Circuit on the district court's order granting Defendant's motion to dismiss for lack of Article III standing.  ECF No. 104.  The district court had dismissed the complaint upon finding that Plaintiffs' fear of future arrest and prosecution under the Disturbing Schools and Disorderly Conduct Laws did not rise above the level of speculation and therefore did not constitute an injury in fact.  In vacating the district court's order of dismissal, the Fourth Circuit observed in relevant part:

> at least some of the named plaintiffs do not rely on conjecture or speculation, but rather, on the fact that they attend school where they were previously arrested and criminally charged under the two South Carolina statutes, and they don't know

3

which of their actions at school will be interpreted to violate the statutes in the
future.

*Kenny v. Wilson*, 885 F.3d 280, 281 (4th Cir. 2018). The Circuit further observed that Plaintiffs

"allege that the two laws chill their exercise of free expression, forcing them to refrain from

exercising their constitutional rights or to do so at the risk of arrest and prosecution." *Id.* The

Circuit held that with these allegations Plaintiffs sufficiently pleaded both a future and ongoing

injury in fact and remanded the case for further proceedings. ECF No. 102. Defendant filed a

renewed motion to dismiss, which the court denied in an order issued March 30, 2020. ECF No.

185.

On February 24, 2021, the court granted Plaintiffs' motion to certify class and certified the

following class with respect to Plaintiffs' request for an injunction against enforcement of the

Disorderly Conduct Law:

> All elementary and secondary school students in South Carolina, each of whom faces
> a risk of arrest or juvenile referral under the broad and overly vague terms of S.C.
> Code § 16-17-530 while attending school ("Enforcement Class").

ECF No. 201. The court additionally certified two injunctive relief sub-classes for purposes of

obtaining an injunction against retention of records under both S.C. Code § 16-17-420 and S.C. Code

§ 16-17-530, as follows:

> All elementary and secondary school students in South Carolina for whom a record
> exists relating to being taken into custody, charges filed, adjudication, or disposition
> under S.C. Code § 16-17-530 ("Disorderly Conduct Law Sub-Class");

and

> All elementary and secondary school students in South Carolina for whom a record
> exists relating to being taken into custody, charges filed, adjudication, or disposition
> under S.C. Code § 16-17-420 prior to May 17, 2018 ("Disturbing Schools Law Sub-
> Class").

ECF No. 201.

4

The parties proceeded with discovery and, on July 23, 2021, filed cross motions for summary judgment.  ECF Nos. 215, 216.  The parties now agree that Plaintiffs Kenny and Nesmith, who proceed in this lawsuit as individuals, should be dismissed from the action.[3]  The parties completed the briefing of their summary judgment motions on September 1, 2021, *see* ECF Nos. 217-224, 226-227, 230-231, and the court heard oral argument by telephone on October 4, 2021.

## LEGAL STANDARD

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence or non-existence would affect the disposition of the case under the applicable law.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248–49 (1986).  When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits "to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Philip Morris Inc. v. Harshbarger,* 122 F.3d 58, 62 n.4 (1st Cir. 1997)).  "When considering each individual motion, the court must take care to resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Id.* (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996) (internal quotation marks omitted).

## UNDISPUTED FACTS

The following facts are material to the disposition of the motions for summary judgment and are not disputed.

---

[3] Plaintiffs Kenny and Nesmith sought injunctive relief from enforcement of the Disturbing Schools Law. ECF No. 167 at 2.  The parties agree that Kenny and Nesmith's claims are moot due to the amendment to the Disturbing Schools Law. ECF No. 167 at 4. Girls Rock remains in the lawsuit as an individual litigant, proceeding outside of the classes.

**D.D.**

Plaintiff D.D. is an African American male who, in February 2019, was enrolled in the tenth grade at Conway High School in the Horry County School District. ECF No. 217 at 2. During the spring of 2017, he was enrolled at Whittemore Park Middle School as an eighth-grade student. *Id.* D.D. attests that on the evening of April 19, 2017, following a normal school day, his mother received a phone call from Whittemore Park Middle School's Eighth-Grade Assistant Principal, Demetrius Williams, who instructed D.D.'s mother that D.D. could not return to school the next day. When asked why, Assistant Principal Williams declined to discuss the matter over the phone and directed D.D. and his mother to meet him at the school the following day. *Id.* When D.D. and his parents reported to the school, they were met by Student Resource Officer ("SRO") Christopher Nguyen, with whom D.D. had never before interacted, Head Principal Quintina Livingston, and Seventh-Grade Assistant Principal Carla McGaha. *Id.* at 2-3. Assistant Principal McGaha told D.D. and his parents that another student had written on social media that D.D. was "going to shoot up a school." *Id.* at 3. Assistant Principal McGaha shared that "she had statements from multiple students who heard [D.D.] talking about shooting up a school the previous day when [he] was on the school bus heading home." *Id.* D.D. attests that he was scared and confused listening to the accusation because he "had not said anything like that." *Id.* Assistant Principal McGaha did not identify the students whose social media accounts she had reviewed or from whom she had obtained statements. D.D. and his parents asked to see the written statements, "but no evidence of the statements or the social media post was shown to [them]." *Id.* The SRO informed D.D. that he was being charged "with Disturbing Schools," because "the school had to conduct an investigation and had to call law enforcement to patrol the school grounds the following day." *Id.* D.D. attests that upon being charged, he was scared and then later angry, because he had been charged "with

6

something [he] did not do," and he "did not know what to think." *Id.* Assistant Principal McGaha and the SRO told D.D. that he was not allowed on school property until his hearing, notice of which would arrive by mail. D.D. attests he was shocked, that he had no warning that students had made these allegations, and he was scared: "[t]hey were talking about 'shooting up a school' and it scared me. I never said anything like that or heard anything like that." *Id.*

D.D. attests that "everything started to go bad for [him]" after the meeting; he stopped eating and stopped talking to people; and he sat alone in the dark and oftentimes would stay up all night, unable to sleep. *Id.* He attests that he loved going to school, he was an honor roll student, and he loved playing basketball; but after the meeting he stayed home, could not go to school, and did not speak to his friends. *Id.* at 3-4. After the meeting, D.D.'s father would pick up assignments to take home for D.D. to complete and would then return the assignments to school. D.D. was allowed back in school during one week between his initial hearing and the appeal hearing to take the state exam. *Id.* at 4.

His initial hearing was held April 27, 2017, at the school. D.D. attended the hearing with his parents and advocates from Horry County Allowance for Educational Justice, Dameion Fowler, Abdullah Mustafa, and a third individual. ECF No. 217 at 4. Head Principal Livingston, Assistant Principal Williams, and Hearing Officer Steven Fitch were also present. The SRO did not attend. *Id.* Assistant Principal Williams presented D.D. with an evidence packet that included written statements from the students who raised the allegations about D.D.'s comments, the police incident report, and D.D.'s grades. D.D. attests that he had not before seen any of the evidence and the students who had written the statements were not identified. *Id.* He states that his advocates "pressed to learn more details about what I was accused of, but Head Principal Livingston and Assistant Principal Williams had no specific answers." *Id.* D.D. received the school district's

official decision via email during the week of April 30, 2017; the district had decided not to expel

him but would require that he transfer to an alternative school.  He appealed the decision.  Prior to

the hearing on his appeal, the advocate working on his behalf, Mr. Mustafa, met with City of

Conway Chief of Police, Reginal Goselle, and D.D.'s parents.  *Id.* at 4-5.  D.D. attests that his

advocate and his parents "explained to Chief Goselle the entire story and the lack of evidence," and

that Chief Goselle "apologized and said, 'I have to make this right.'"  *Id.* at 5.  D.D. and his mother

learned the following day through a call from the Solicitor General's Office that the "case was

dismissed."  *Id.*  D.D. then received a letter in the mail from the Solicitor General's Office

confirming dismissal but advising that the Disturbing Schools charge would remain on his record.

*Id.* at 5, 8.

D.D.'s appeal hearing was held May 15, 2017, at the Horry County School District Office,

before the Head of Student Affairs of Horry County Schools HT Lee and four other civilians.  ECF

No. 217 at 5.  D.D. appeared at the hearing with his parents, Mr. Fowler, and Mr. Mustafa.  He

attests that he had been "out of school for a while before this appeal hearing and I had time to think

about what I was going to say. I was angry, but I was in front of a lot of people and I had to just

show that I did not do this"; he also informed the board that the Solicitor General's Office had

dismissed the charge.  *Id.*  The board delivered its decision at the conclusion of the hearing, agreeing

with the initial ruling that D.D. would attend alternative school. As a consequence, D.D. was not

allowed to continue completing his class assignments from home because Whittemore Park Middle

School was no longer his base school, and he was not allowed to attend the eighth-grade prom and

graduation.  *Id.*  D.D. appealed the decision to the Board of Horry County Schools, which upheld

the board's decision.

D.D. attests that the Disturbing Schools charge impacted his health; it affected his interest in eating, speaking, and sleeping, and he started the ninth grade on homebound education due to anxiety and depression.  ECF No. 217 at 5.  D.D. continues to be counseled by his grandmother, who is a pastor.  *Id.*  D.D. further attests that "[t]he home bound education teacher only came a handful of times in about a month," and he and his parents "were concerned that [he] was not getting an education."  *Id.*  D.D. attended alternative school and attests "[i]t was terrible[,] [t]he only thing they did was give me a computer and put me on a website"; he "was not focused on friends," he "was just trying to get out of there and get back to a normal high school."  *Id.*

D.D. was released from alternative school after three weeks and he entered Conway High School in the ninth grade.  ECF No. 217 at 5.  He attests that the teachers expected him "to know everything and it was hard because I did not know what to do"; "[t]hey treated me as if I was there the whole year and I barely survived"; "[t]rying to catch up with the other kids was probably the hardest thing I did in the 9th grade."  *Id.* at 5-6.  D.D. attests that he still has trouble eating and sleeping and at times concentrating; and that sometimes "I look at the stuff on the Internet regarding the incident because I'm all over the Internet and I cry about it."  *Id.* at 6.  He attests that "[s]ome weeks I am ok and other weeks the depression hits hard and I do not want to talk to anyone."  *Id.*  D.D. suffered a breakdown at school at the end of January 2019 and spoke to the one school counselor with whom he felt comfortable sharing his feelings.  He attests his depression has impacted his grades.  *Id.*  Finally, D.D. attests that because of the Solicitor's letter, he fears the Disturbing Schools charge could be used against him in a prosecution and also that "something like this" could happen to him again.  *Id.*  He fears that "someone else could consider any of [his] words or actions to be a violation of the Disorderly Conduct law," and that he could be charged and made to endure a similar experience.  *Id.*

**D.S.**

D.S. is an African American female who, in August 2016, anticipated attending Summerville High School in Dorchester School District Two. ECF No. 218. She had attended Stall High School in Charleston County School District during the 2015-2016 academic year. D.S., who lives with her grandmother, was diagnosed as a small child with lead poisoning, which condition impacted her "developmental health," and "makes it more challenging for [her] to learn." *Id.* at 2. She has an Individualized Education Plan to help her achieve an education and she plans to attend college and become a nurse. *Id.*

D.S. was charged with violating the Disturbing Schools Law. She was 17 at the time and therefore charged as an adult. ECF No 218 at 2. D.S. attests that on the morning of April 8, 2016, two girls approached her and her friend in the school hallway and started a physical altercation. One of the girls hit D.S. in the head and, after teachers intervened to end the fight, D.S. went to the nurse's office and received an ice pack. *Id.* at 2-3. While in the nurse's office, a police officer asked D.S. to submit in writing her account of what had happened. D.S.'s grandmother was ultimately called to pick up D.S. and take her home. *Id.* at 3. D.S. received a notice of disciplinary action, imposing a five-day suspension from school, and a citation charging her with Disturbing Schools. *Id.* at 3, 6-7, 9. D.S. attests that she did not understand why she was charged with a crime and she was "scared about what would happen." *Id.* at 3. She, along with the other three students, attended a hearing on May 5, 2016. She attests that no one had prepared her for what would happen at the hearing and that "the experience was confusing." *Id.* The same police officer was at the hearing and he recommended that the court order pretrial intervention. D.S. attests that "there was a lot going on that I did not understand." *Id.* She was sentenced to a $400 fine or 20 days in jail, which was deferred to allow her to complete Pretrial Intervention. *Id.* at 3, 11, 14. Only after the

hearing did D.S. learn that she had to pay charges amounting to $450 to apply to participate in the

Pretrial Intervention program. *Id.* at 3, 18. D.S. completed the application, knowing that she and

her grandmother did not have the money to pay the fees, *id.* at 3, and she ultimately received a

notice of rejection due to her failure to pay, *id.* at 4. D.S. attests that she became overwhelmed by

the situation; she experienced headaches and trouble sleeping, and she was concerned about the

stress the situation was causing her grandmother. She ultimately found representation through a

public defender, who moved to reopen the case and withdraw D.S.'s guilty plea. *Id.* D.S.'s case

was dismissed. D.S. worries, however, that "teachers, police and other people will think of [her] as

a trouble maker or a bad person." *Id.* She is afraid that she could be charged with a crime under the

Disturbing Schools Law or Disorderly Conduct Law "based on something that happens at school if

a police officer or someone else at school considers it a crime." *Id.*

## S.P.

S.P. is a white female who, in July 2016, was fifteen years old. ECF No. 219 at 2. She was

a freshman at Travelers Rest High School in the Greenville County School District during the 2015-

2016 school year and she anticipated returning for her sophomore year. She is diagnosed with

disruptive mood dysregulation disorder, which causes her to become irritable when she feels

threatened or is confronted. *Id.* at 2-3. She has received treatment from a therapist since 2007. She

requested special education services to address her disability and during her freshman year she

received a Behavior Intervention Plan. *Id.* at 3, 7. The Behavior Intervention Plan lists two "safety"

people she can ask to speak to if she gets upset and feels the need to leave the classroom in order to

calm down. *Id.* During the morning of October 28, 2015, a fellow classmate, with whom S.P. had

an ongoing conflict, mocked S.P. when S.P. became upset over losing her pencil. *Id.* at 3. When

the two girls entered their next class, the classmate continued mocking S.P., calling her "fat" and

"ugly" and telling her she sounded like a man. *Id.* S.P. became increasingly upset. At lunchtime, S.P. went to the library, where she saw the same classmate; S.P. approached the classmate and told her to "stop talking about me," and then joined her friends at another table. *Id.* at 3. S.P. heard the librarian summon a school administrator over the phone and saw the school principal enter the library. The principal told S.P. to leave the library with him, and S.P. responded that she "had not done anything wrong," and "did not want to talk to him." *Id.* The principal called for an SRO to join them in the library. S.P. attests that "the girl who had been making fun of me throughout the day was laughing at me"; S.P. asked the principal "why he was not doing anything about [the girl]," and he responded, "I could arrest you for not coming with me, so I have to address you." *Id.* at 3-4.

S.P. attests that she "was upset that the principal was continuing to focus on me while the other girl was laughing at me and because they had not done anything to address her making fun of me earlier during the day." *Id.* at 4. After the SRO arrived, S.P. continued to protest that she did not want to talk to them; she attests that she became increasingly frustrated because the classmate continued to laugh at her and she "just wanted to be left alone." *Id.* S.P. attests that she "realized that they were not going to leave me alone and that I was going to get arrested, because that is what the principal had told me," and she said to the SRO, "are you going to put me in handcuffs or not, apparently I'm getting arrested." *Id.* The SRO replied that she could be sent home, to which S.P. said, "I'd rather be home than in this hell," and the SRO responded, "let's go take care of that." *Id.* As S.P. left the library with the SRO and the principal, she walked past the classmate who had been teasing her and S.P. said to her, "something like, 'you think this is funny, huh,'" to which the classmate nodded her head yes, and S.P. said "f--- you." *Id.* S.P. attests that several students started clapping as she left the library, which upset her, and she responded by saying, "f--- all of you." *Id.*

The principal sent S.P. to in-school-suspension for the remainder of the school day and

imposed out-of-school suspension for four days for "major disruption."  *Id.*  S.P. was then placed on

probation, which required that she not receive any referrals, not be late, and not be absent without an

excuse.  On April 29, 2016, she received a letter from the Department of Juvenile Justice informing

that she had been charged with Disorderly Conduct, S.C. Code § 16-17-530.  *Id.* at 4-5, 9, 11.  S.P.

was initially unable to retain a public defender because she and her mother, with whom she lives,

could not afford the $40 application fee.  She was eventually able to secure the representation of a

public defender.  *Id.* at 5.  She attests that after that experience, she was afraid she could again be

charged with a crime like Disorderly Conduct or Disturbing Schools while at school if any of her

"actions or statements are considered to fall under the terms of those laws."  *Id.*

### Captain Michael Rinehart

Captain Rinehart oversees the Specialized Investigations for the Greenville County Sheriff's

Office, which includes the school enforcement unit.  ECF No. 215-4 at 3, 12:4–13:15.  He

previously served as supervisor of the school enforcement unit and he additionally conducted

training, reviewed incident reports, and served as liaison to the school district.  *Id.* at 5, 17:7–21.

Deputies assigned to the school enforcement unit are responsible for the safety and security of the

school campus and for investigating criminal incidents related to the school or its students.  *Id.* at

10, 31:10-16.  School resource officers attend the South Carolina Criminal Justice Academy's two-

week SRO certification class.  *Id.* at 11, 39: 14-16.  Captain Rinehart testified as follows as to how a

resource officer might handle an incident:

> The SRO is going to . . . try to evaluate what's going on. Even if the teacher or the
> administrator has tried to de-escalate the situation, we would continue – if the
> individual's behavior was still beyond the normal, we would try to de-escalate that.
> It may be a situation if the teacher or the administrator did not try to de-escalate that,
> we could work on that as well, ask the student to step outside, hey, talk to us, what's
> going on, things like that.

*Id.* at 12, 55:4-18.  In response to the question, "would it be possible ever for that officer to

determine that the student's behavior was not beyond normal," Captain Rinehart testified, "yes."  *Id.*

at 55:19-23.  Captain Rinehart testified: "[y]ou would basically tell them that they – we didn't feel it

was sufficient probable cause for a criminal charge or it wasn't a matter that we needed to be

involved in and that they needed to handle it administratively."  *Id.* at 12, 55:24-56:5.  He further

testified that such a situation happens "probably [] more often than not."  *Id.* at 13, 56:6-12.

When asked if he ever receives pushback from a teacher or administrator who believes a

student has violated the law, and how he manages that situation, Captain Rinehart testified:

> We basically explain to them that we've reviewed the situation and the
> circumstances, and that based on the circumstances that have been presented to us,
> all of the factors that have [sic] taken into consideration, evaluated and looked over,
> that it's not a criminal matter and it's not something that we need to be involved in.

ECF No. 215-4 at 14, 57:4-15.  When asked under what circumstances might a student be charged

with disorderly conduct, Captain Rinehart testified:

> Causing a severe disruption inside a classroom [], causing a severe disruption during
> class change, [], in the cafeteria or in a setting, in an office setting, say an
> administrator is having a meeting with them and their behavior gets out of control,
> obviously if they come to school intoxicated and aggressively intoxicated, situations
> like that.

*Id.* at 14, 57:16-58:2.  As to what would constitute a serious disruption in a cafeteria, he testified:

> If you had an individual that's being so loud that they're gaining the attention of
> their fellow students, let's say they're jumping on top of the table in – in the
> cafeteria or – it would not be dissimilar to us being out in public and someone is
> causing such a disturbance that it would cause me to look over and see what's going
> on versus someone having a loud discussion with someone.

*Id.* at 15, 58:3-16.  In response to the question, "would it always be a violation of the disorderly

conduct statute if someone's behavior in the cafeteria attracted the attention of others," Captain

Rinehart testified, "[n]ot necessarily."  *Id.* at 58:17-21.

When asked how he would determine if someone had been loud or boisterous to the extent the individual had engaged in disorderly conduct, he testified:

> Obviously, there are a lot of considerations you need to take in – in that, the setting, overall environment, an individual or group's behavior, something that they had – the Criminal Justice Academy taught us a long time ago is a statement of what they call totality of the circumstances. Without having a specific incident or being in a specific situation, it's a little difficult for me to answer that question. . . .
> There are – there are just a lot of factors that – that go into, obviously, in making a decision of whether to enforce that law or not. And the individual circumstances and the discretion of the officer, obviously, are things that play a role in that as well.

ECF No. 223-13 at 4, 48:4-49:6.

When asked if "it would be accurate to say that determining whether someone has engaged in loud and boisterous behavior in violation of the disorderly conduct statute would depend on the officer's judgment of that individual circumstance," Captain Rinehart responded, "[t]hat is a factor, yes." ECF No. 223-13 at 5, 49:7-14. When asked about what other factors he would take into consideration, Captain Rinehart testified: if the individual, let's say, for instance, is using profanity, is it something where it's in close proximity of smaller children or something to that effect." *Id.* at 49:15-25. When asked how he determines when a student is charged and when a student should not be charged, Captain Rinehart testified: "the officer has to make his own personal observations, talk to witnesses and review what he has available to him . . . [e]ach individual officer has discretion . . . ." *Id.* at 6, 63:2-11. In response to the question as to whether it is possible "that a different officer would have a different judgment of when the use of curse words or profanity violate the disorderly conduct statute," Captain Rinehart stated, "I would say yes." *Id.* at 7, 65:22-66:1.

### School Codes of Conduct

In many South Carolina school districts, behaviors criminalized by the Disorderly Conduct and Disturbing Schools Laws are indistinguishable from behaviors that are assigned minimal penalties under school codes of conduct. ECF No. 216-1 at 14. For example, in Greenville schools,

"disorderly acts" are included among the lowest level offenses in violation of the school code of conduct and may lead to discipline as minor as a verbal reprimand.  ECF No. 223-3 at 4.  *See* ECF No. 223-4 at 9, Richland County School District One 2018-2019 Student Handbook (defining "Disruption of Class/Activity" as a Level I offense); ECF No. 223-5 at 2, Richland School District Two Code of Conduct (defining activities "which tend to impede orderly classroom procedures or instructional activities, orderly operation of the school, or the frequency or seriousness of which may disturb the classroom or school" at the lowest level of behavioral misconduct subject to consequences including a verbal reprimand); ECF No. 224 at 29, Charleston County School District Student Handbook (listing among the lowest level offenses to be managed in the classroom "conducting oneself in a disruptive or disrespectful manner," which includes making "[a]ny loud sound that is unnecessary or interferes with the learning environment," as well as ""[r]ough or boisterous play or pranks").

In a letter composed in June 2010 and addressed to the Superintendent of Lexington County School District One, the Solicitor for the Eleventh Judicial Circuit asked that "the Schools handle a juvenile's first two charges occurring at school if the charges are Disturbing Schools or Disorderly Conduct."  ECF No. 222-11.  The letter noted that many of the student behaviors criminalized under the Disturbing Schools and Disorderly Conduct Laws "are behavioral issues rather than criminal acts," and stated that the Solicitor's Officer would no longer prosecute the first two offenses of either law and asked that the schools provide intervention and sanctions for those charges.  *Id.*

### Expert Testimony

Plaintiffs' expert, Joseph B. Ryan, Ph.D., Distinguished Professor of Special Education at Clemson University, wrote in his report that "[b]ehavioral and social skills are learned through the process of adolescent development."  ECF No. 221 at 5.  He explained that "educators can . . .

change or shape a child's behavior," *id.* at 5; and researchers have identified a number of evidence-

based practices for managing challenging student behaviors. *Id.* at 4; 10–18. Where training and

support for the use of evidence-based behavior management strategies is lacking, "schools have

increased their use of punitive [and] exclusionary disciplinary approaches . . . ranging from

suspension . . . [to] criminal charges." *Id.* at 6; *see also id.* at 8. Punitive and exclusionary

approaches "are often ineffective at addressing problem behaviors," in part because they "fail to

teach appropriate alternative behaviors," and "may inadvertently reinforce a problem behavior." *Id.*

at 7. In addition to being generally ineffective, punitive disciplinary strategies are

disproportionately applied to students of color, students from low socioeconomic status families,

and students with disabilities. *Id.* at 8–9. For example, "Black students are suspended three times

more frequently than their Caucasian peers," and "students with disabilities are" suspended at twice

the rate of students without disabilities. *Id.* at 9. Researchers have found that "significant racial

disparities exist[ ] in school discipline even after accounting for [socioeconomic status]." *Id.* There

is also a racial disparity in the types of offenses which lead to suspension: "African American

students were more likely to be suspended for subjective types of offenses (e.g., disrespect,

excessive noise)," while white students were more often suspended for "more objective types of

offenses (e.g., smoking, vandalism)." *Id.* at 9-10.

Dr. Ryan prepared a supplemental report, in which he discussed in part the increase in

presence of the police in schools across the nation. ECF No. 222. He explained that this increased

presence has resulted in "a significant increase in the number of nonviolent arrests on school

grounds." *Id.* at 4. "For example, research has shown that schools with police have five times as

many arrests for disorderly conduct as schools without police." *Id.* He opined that this has

disproportionately impacted students of color and students with disabilities: data recently reported to

the U.S. Department of Education showed that "while Black students represented only 15% of the school population, they accounted for 31% of students referred to law enforcement or school related arrests." *Id.* at 4. Additionally, students with disabilities accounted for 82,800 of 291,100 students referred or subject to school-related arrest nationwide. *Id.* He explained that a review of multiple studies found that "police presence did not have a positive influence on schools, and may have a negative one by increasing referrals of students into the juvenile justice system." *Id.* at 5-6. And, contact with the juvenile justice system increases the risk that a young person will drop out of school and that they may be incarcerated later in life. *Id.* at 6.

### South Carolina Department of Juvenile Justice Records

During the course of this litigation, the South Carolina Department of Juvenile Justice ("DJJ") provided to Plaintiffs' counsel data representing all instances in which a juvenile was referred to DJJ for the charge of Public Disorderly Conduct, S.C. Code Ann. § 16-17-530, from August 1, 2015 through July 30, 2020. ECF No. 223 at ¶ 5.[4] Referrals for Black and white individuals made up 96.4 percent of all referrals. *Id.* at ¶ 6. Between August 3, 2015 and July 30, 2020, law enforcement received 5,120 referrals of youth for disorderly conduct in South Carolina. *Id.* at ¶ 17. Black youth comprise 74.9 percent of youth referrals to law enforcement for disorderly conduct, despite comprising only 29.9 percent of the population aged 5–17. *Id.* at ¶ 18. Statewide, Black youth were charged with disorderly conduct in school at 6.36 times the rate of white youth. *Id.* at ¶ 19. Of the 5,120 referrals of youth for disorderly conduct, 3,735 cases—or 72.9 percent— were school-related. *Id.* at ¶ 20. Black youth comprise 29.9 percent of the total statewide youth

---

[4] Defendant does not dispute the accuracy of the data but asserts that Plaintiffs "have made no racial discrimination claim and provide no evidence that vagueness is responsible for the difference." ECF No. 226 at 6. The court finds the data, specifically the evidence of racial disparity in referrals to DJJ, material to the issue of arbitrary and discriminatory enforcement.

population aged 5–17 but comprise 75.3 percent of all school-related disorderly conduct referrals. White youth comprise 54.7 percent of the statewide youth population aged 5–17 but comprise only 21.0 percent of school-related disorderly conduct charges. *Id.* at ¶ 21.

Of the 3,735 school-related disorderly conduct referrals, in 3,166 cases (or 84.8 percent), DJJ identified disorderly conduct as the only or most serious charge. Black youth were the subject of 74.6 percent of school-related disorderly conduct referrals where disorderly conduct was the only or top charge. *Id.* at ¶ 22. Between 2015 and 2020, Black youth were referred to law enforcement in schools at 6.55 times the rate of white students. *Id.* at ¶ 25. The ages of youth charged under the Disorderly Conduct Law in this data ranged from 8 to 18; more than half (58.1 percent) of youth charged with disorderly conduct in schools were between the ages of 15 and 16. *Id.* at ¶ 35. The data reflect five cases in which the student charged with disorderly conduct was under the age of 10; 100 percent of the youth charged below the age of 10 were Black. *Id.* at ¶ 36.

DJJ also provided to Plaintiffs' counsel data representing all instances in which a juvenile was referred to DJJ for the charge of Disturbing Schools, S.C. Code Ann. § 16-17-420, from 2001 through 2015. ECF No. 222-1. Between August 2010 and March 2016, over 9,500 adolescents entered the juvenile justice system on charges of Disturbing Schools. ECF No. 223-1 at ¶ 15. Between 2014 and 2015, in Charleston and several other South Carolina counties, more young people entered the juvenile justice system because of school disruption charges than for any other reason. ECF No. 222-1 at ¶¶ 11–12. Students as young as 7 have been charged. ECF No. 223-1 at ¶ 16. Historically, Black students are nearly four times as likely to be referred for Disturbing Schools. *Id.* at ¶ 19. In the 2014–2015 school year in Charleston, Black students were approximately six-and-a-half times more likely to be referred for Disturbing Schools than were their white classmates. *Id.* at ¶ 23.

An individual who seeks to clear his or her record of a Disorderly Conduct or Disturbing Schools charge must apply to the local solicitor's officer to have the record expunged and pay up to $310 in fees.  ECF No. 222-10.

Craig Wheatley, the manager of data and statistics for DJJ, testified during his deposition that the total number of students referred for violations of one of the challenged statutes dropped from approximately 3,000 students referred to DJJ in the 2015-2016 school year to 1,058 referred in the 2019-2020 school year, including, with respect to the latter number, an undetermined number of non-school related charges.  ECF Nos. 215-3, 215-2.

## DISCUSSION

A state violates due process if it deprives a person of "life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).  "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  *See Lanzetta v. New Jersey*, 306 U.S. 451, 453 (1939) ("No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids").  To survive a vagueness challenge, a statute must give a person of ordinary intelligence adequate notice of what conduct is prohibited and must include sufficient standards to prevent arbitrary and discriminatory enforcement.  *Manning v. Caldwell for City of Roanoke*, 930 F.3d 264, 272 (4th Cir. 2019) (citations omitted).  *See Connally v. General Construction Co.*, 269 U.S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law") (citations omitted).

"A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application."  *Grayned*, 408 U.S. at 108-09.

Criminal laws are subject to a stricter standard on a vagueness review due to the stigmatizing nature associated with resulting criminal penalties.  *Manning*, 930 F.3d at 272-73.  *See Village of Hoffman Estates v. Flipside,* 455 U.S. 489, 499 (1982) (explaining the Court has "expressed a greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe") (citation omitted).  Of principal concern for the void-for-vagueness doctrine is "the requirement that a legislature establish minimal guidelines to govern law enforcement."  *Kolander v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Smith v. Goguen*, 415 U.S. 566, 574 (1974)).  "Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections."  *Id.* at 358 (citation and internal quotation marks omitted).   The analysis assessing whether a statute sufficiently places a citizen on notice of the prohibited conduct often converges with the analysis assessing whether the statute offers sufficient guidance to law enforcement. *Johnson v. Quattlebaum*, 664 Fed. Appx. 290, 294 (4th Cir. 2016) (citation omitted).

Finally, "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Village of Hoffman Estates*, 455 U.S. at 499.  "Uncertain meanings inevitably lead citizens to steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Grayned*, 408 U.S. at 109 (citations and internal quotation marks omitted).  Accordingly, "a more stringent vagueness test should apply" to a law that interferes with the right of free speech

or association.  *Village of Hoffman Estates*, 455 U.S. at 499.  *See Goguen*, 415 U.S. at 573 ("Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine [of vagueness] demands a greater degree of specificity than in other contexts"); *Town of Honea Path v. Flynn*, 176 S.E.2d 564, 567 (S.C. 1970) ("The standard of certainty required is higher in statutes punishing for offenses than in the case of those depending primarily upon civil sanctions for enforcement. And it is especially high where the offense lies in an area affecting freedom of expression").

Plaintiffs assert that the former Disturbing Schools Law is unconstitutionally vague on its face and that the Disorderly Conduct Law is unconstitutionally vague as applied to elementary and secondary school students in South Carolina.[5]  Defendant asserts that "[t]his case is essentially a facial challenge," because, "[a]lthough the challenge to the disorderly conduct statute is as applied to elementary and secondary students, it is applicable to that very large population rather than to individuals."  ECF No. 215-1 at 10.  "In evaluating a facial challenge to a state law, a federal court must . . . consider any limiting construction that a state court or enforcement agency has proffered."  *Kolander*, 461 U.S. at 355 (quoting *Village of Hoffman Estates,* 455 U.S. at 494).  The parties conceded at oral argument that the outcome of the lawsuit would not change based on whether the court characterizes the challenge as one that is facial or one that is as applied.

Plaintiffs carry the burden of showing the challenged laws are void for vagueness; however, that burden does not require a showing that the laws are incapable of any valid application. *Johnson*, 576 U.S. at 602 ("[O]ur *holdings* squarely contradict the theory that a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp")

---

[5] Plaintiffs clarified during oral argument that while they maintain that the former Disturbing Schools Law is unconstitutionally vague on its face, they seek to invalidate the former law only as to primary and secondary school students.

(emphasis in original); *accord Kolbe v. Hogan*, 849 F.3d 114, 148 n.19 (4th Cir. 2017). The Laws herein at issue impose criminal penalties for prohibited conduct and their scope reaches expression protected by the First Amendment. Accordingly, the due process doctrine of vagueness requires "a greater degree of specificity," *Goguen*, 415 U.S. at 573, and the court applies a stricter standard to its review, *Manning*, 930 F.3d at 272-73.

## I. Mootness

As an initial matter, the court notes that it previously addressed and dismissed Defendant's argument that a Plaintiff's claim becomes moot upon the individual graduating from or otherwise leaving the school system. *See* ECF No. 185 at 7. It is presently unclear whether D.D., D.S., or S.P. are still students enrolled in the South Carolina school system. However, as Plaintiffs argued before the court in opposition to Defendant's renewed motion to dismiss and again during oral argument on the cross motions for summary judgment, the claims herein at issue are inherently transitory such that Plaintiffs likely do not possess a personal stake in the lawsuit long enough for litigation to run its course. *See United States Parole Commission v. Geraghty*, 445 U.S. 388, 389-99 (1980); *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 76 (2013). This lawsuit has been pending over five years, during which time an appeal was heard before the Fourth Circuit and the case was reassigned to a second district court judge. The court certified the class and sub-classes as recently as February 24, 2021. Indeed, the undisputed record reflects that "more than half (58.1%) of youth charged with disorderly conduct in schools were between the ages of 15 and 16." ECF No. 223 at 6. This statistic lends support to the finding that a student is likely to age out of the school system

before his or her claim could be fully litigated and resolved. The court reaffirms its prior ruling that

the named Plaintiffs' claims are not moot.[6]

## II.    The Disorderly Conduct Law

Known as the Disorderly Conduct Law, section 16-17-530 of the South Carolina Code

provides as follows:

> Any person who shall (a) be found on any highway or at any public place or public gathering in a grossly intoxicated condition or otherwise conducting himself in a disorderly or boisterous manner, (b) use obscene or profane language on any highway or at any public place or gathering or in hearing distance of any schoolhouse or church or (c) while under the influence or feigning to be under the influence of intoxicating liquor, without just cause or excuse, discharge any gun, pistol or other firearm while upon or within fifty yards of any public road or highway, except upon his own premises, shall be deemed guilty of a misdemeanor and upon conviction shall be fined not more than one hundred dollars or be imprisoned for not more than thirty days.

S.C. Code Ann. § 16-17-530.

### A.    Arguments

Plaintiffs assert that the terms "disorderly" and "boisterous manner" render subsection (a)

unconstitutionally vague as a matter of law when applied to elementary and secondary students

because such terms fail "to provide students with notice of when their behavior will be considered

criminal" and they "encourage[] arbitrary and discriminatory enforcement."  ECF No. 216-1 at 24.

Plaintiffs additionally assert that the terms "obscene" and "profane language" render subsection (b)

unconstitutionally vague as a matter of law because the statute "fails to provide 'minimal guidelines

---

[6] The court notes that even if the named Plaintiffs' claims became moot upon those individuals' departure from the school system, the class and sub-classes can proceed.  *See Sosna v. Iowa*, 419 U.S. 393 (1975) (recognizing that a controversy may exist between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot, if the named plaintiff in the class action shows that the threat of injury is "real and immediate" and if the named plaintiff was a member of the class which he or she sought to represent at the time the district court certified the class action).

to govern law enforcement' against schoolchildren." ECF No. 216-1 at 31.  Plaintiffs contend that this subsection prohibits the use of profanity even when the words do not give rise to "fighting words," and criminalizes voicing criticism and concerns regarding the police.  *Id.* at 16-17, 28-29, 32.[7]

Defendant asserts that the Disorderly Conduct Law has "been in force for decades," is "applied to only a tiny percentage of students annually," and is an important "tool of law enforcement in dealing with disruptive and fighting students."  ECF No. 226 at 1-2.  Defendant asserts that "language alone is not a basis for charging a person under § 16-17-530 unless fighting words are used," and contends that the Law is similar in nature and scope to "[n]umerous disorderly conduct statutes and ordinances of other states [that] have been upheld as not unconstitutionally vague."  ECF No. 215-1 at 21, 22.  In support, Defendant chronicles several incident reports regarding students who were charged under the Law for behavior that "involve[s] far more serious conduct than children being children or being 'annoying.'"  ECF No. 226 at 2-5.  Defendant notes that "Plaintiffs' own behaviors come well within the statute although only S.P. was adjudicated delinquent."  *Id.* at 5.  Defendant suggests that Plaintiffs conflate the constitutional argument with their efforts to advocate for changes in education policy and school disciplinary measures.  ECF No. 226 at 1-2.

---

[7] The First Amendment "protects a significant amount of verbal criticism and challenge directed at police officers"; the "freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *City of Houston, Texas v. Hill*, 482 U.S. 451, 461, 462-63 (1987). Even the exception for fighting words "might require a narrower application in cases involving words addressed to a police officer, because a properly trained officer may reasonably be expected to exercise a higher degree of restraint than the average citizen, and thus be less likely to respond belligerently to fighting words." *Id.* at 463.

In reply, Plaintiffs contend that the "severe and stigmatizing adverse consequences" for schoolchildren charged under the Disorderly Conduct Law "are relevant to the Court's consideration, and due process requires a correspondingly high standard of certainty in the terms of the laws." ECF No. 231 at 2, 3. Plaintiffs further assert that the disparity in how the Law is enforced against Black students and against students with disabilities, "in lieu of providing required supportive responses," is "squarely relevant to the vagueness analysis." *Id.*

**B.**    **Findings**

1. *Generally*

The court agrees that the terms "disorderly," "boisterous manner," and "obscene and profane language" are unconstitutionally vague on their face as applied to primary and secondary school students because the statute fails to provide both sufficient notice of what conduct is prohibited and a standard for enforcement.

The statute does not define "disorderly" or "boisterous."[8]  Merriam Webster defines "disorderly" as "characterized by disorder," and as "engaged in conduct offensive to public order." Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/disorderly (last visited September 23, 2021). The reference site defines "boisterous" as "noisily turbulent," and "marked by or expressive of exuberance and high spirits." Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/boisterous (last visited September 23, 2021).

Plaintiffs contend that "[a]ny effort to distinguish normal childhood and adolescent behavior and misbehavior from criminally 'disorderly' or 'boisterous' conduct necessarily and impermissibly

---

[8] "When a word is not defined by statute, [a court] normally construe[s] it in accord with its ordinary or natural meaning." *Smith v. United States*, 508 U.S. 223, 228 (1993).

26

turns on subjective judgment." ECF No. 216-1 at 25. This, in large part, is because elementary and secondary school students "are in many ways disorderly or boisterous by nature." *Kenny*, 885 F.3d at 290. Plaintiffs assert the vague terms of the Law chill free speech and expressive activity, which "attending school inevitably involves." ECF No. 216-1 at 28 (quoting *Kenny*, 885 F.3d at 288). And, because the Disorderly Conduct Law "relies entirely on subjective determinations of whether a child's 'disorderly' or 'boisterous' behavior should be dealt with through school interventions or treated as criminal, it also 'encourage[s] arbitrary and discriminatory enforcement.'" ECF No. 216-1 at 27. Specifically, Plaintiffs argue, "the statute can [] criminalize conduct by students with disabilities where the law elsewhere requires accommodations," and the "vague terms of the law encourage discriminatory enforcement against students of color." ECF No. 216-1 at 29-20.

Captain Rinehart's testimony demonstrates that there is no objective standard for determining what sort of disorderly conduct reaches a criminal level, and that each individual officer relies on his or her discretionary assessment of the circumstances. *See* ECF No. 223-13. The school codes of conduct made part of the record reflect that the sort of disorderly conduct that could be charged as criminal could just as likely be subjected to a verbal reprimand. That schools throughout the state categorize as minor the same behavior that an officer could charge as criminal highlights the lack of notice the Law provides as to what conduct is prohibited. The overlap also underscores the potential for arbitrary enforcement when the decision of whether to charge a student is left to the discretion of an individual officer.

Defendant references several incidents in which he asserts the Law was appropriately enforced to criminalize disruptive behavior. *See* ECF No. 226. Plaintiffs contend that this chronicling of events "misses the mark," because the question before the court is not whether those students were properly charged under the Disorderly Conduct Law but whether the Law, in serving

as an all-purpose tool of law enforcement, violates the Constitution.  ECF No. 231 at 5.  The court

agrees with Plaintiffs that the question is not whether the Law has any valid application.  *Cf.*

*Johnson*, 576 U.S. at 602-03 (recognizing that there can be a straightforward application of an

unconstitutionally vague provision); *cf. also Coates v. City of Cincinnati*, 402 U.S. 611, 616 (1971)

(dismissing the notion that details of an offense could validate the challenged ordinance).  Because

the Disorderly Conduct Law provides no objective criteria by which to apply and enforce it, law

enforcement perennially rely on subjective assessments of the kind of behavior that should be

considered criminal, assessments based on the officers' personal opinions and predilections.  This

degree of unpredictability is not compatible with the protections afforded by due process.  *See*

*Goguen*, 415 U.S. at 575 (holding as incurably standardless statutory language that allows

policemen, prosecutors, and juries to pursue their personal predilections, stating that "[l]egislatures

may not so abdicate their responsibilities for setting the standards of the criminal law").[9]

Worse, the incursion on the students' due process rights is not harmless.  The undisputed

record demonstrates that the absence of objective criteria has in fact led to discriminatory

enforcement of the Law.  Specifically, the subjectivity governing the decision-making process of

who should be charged and under what circumstances has led to a disproportionate number of Black

students and students with disabilities entering the juvenile justice system.  *See* ECF Nos. 222-1,

223.  The undisputed record further demonstrates that contact with the juvenile justice system

---

[9] Implicit in Captain Rinehart's testimony is that a charge under the Law is appropriate if the officer cannot de-escalate a situation.  This standard is not found in the language of the Law, however.  Even more problematic is how any such standard is applied in practice.  Take for example S.P. who because of her disability is more likely to exhibit behavioral issues.  When she engaged in conduct consistent with her disability, she was arrested for violation of the Disorderly Conduct Law.  If the unwritten standard for enforcement is an officer's inability to de-escalate a situation, then a student such as S.P., who by virtue of her disability is known to engage in conduct that is difficult to de-escalate, is vulnerable on a recurring basis to sustaining a criminal charge.

increases the risk that a young person will drop out of school and that he or she may be incarcerated later in life.  *See* ECF No. 222.

Defendant asserts that "invalidating the disorderly conduct statute would remove a tool of law enforcement in dealing with disruptive and fighting students who are yelling at staff and visitors, hitting other students, running away from staff, kicking over furniture, hitting doors, shoving staff and law enforcement."  ECF No. 226 at 1.  However, the Constitution does not permit criminal laws broadly drafted to serve as all-purpose tools of law enforcement.  *See Goguen*, 415 U.S. at 575 (admonishing legislators against "entrusting lawmaking to the moment-to-moment judgment of the policeman on his beat'") (citation omitted); *Papachristou v. City of Jacksonville*, 405 U.S. 156, 165 (1972) (noting the danger associated with allowing the legislature to "set a net large enough to catch all possible offenders, and leav[ing] it to the courts to step inside and say who could be rightfully detained, and who should be set at large") (citation omitted); *Coates*, 402 U.S. at 614 (explaining that the city is free to prohibit certain conduct through the enactment and enforcement of ordinances directed with reasonable specificity toward the conduct to be prohibited but cannot "constitutionally do so through the enactment and enforcement of an ordinance whose violation may entirely depend upon whether or not a policeman is annoyed"); *City of Chicago v. Morales*, 527 U.S. 41, 71 (1999) (Breyer, J., concurring in part and concurring in the result) ("[The ordinance] is unconstitutional, not because a policeman applied his discretion wisely or poorly in a particular case, but rather because the policeman enjoys too much discretion in *every* case . . . [a]nd if every application of the ordinance represents an exercise of unlimited discretion, then the ordinance *is* invalid in all its applications"); *Manning*, 930 F.3d at 276 (finding as unacceptable that application of the challenged phrase in an individual case would depend "entirely upon the prohibition philosophy of the particular individual enforcing the scheme at that moment").  The

conduct Defendant references is serious in nature, as is the State's responsibility to protect the children and adults who populate its schools. However, the State has a constitutional responsibility to draft a law that addresses with specificity the concerns Defendant raises.

### 2. Use of "Fighting Words"

Defendant asserts that the terms "obscene or profane language" as used in subsection (b) of the Disorderly Conduct Law do not suffer from vagueness or offend free expression because the South Carolina Court of Appeals has construed the subsection to require the use of unprotected fighting words to sustain a conviction. *See City of Landrum v. Sarratt*, 572 S.E.2d 476 (S.C. App. 2002). Therefore, Defendant contends, subsection (b) criminalizes only obscene or profane speech that is not protected by the Constitution and only when it is uttered in specific locations. *See Johnson v. Quattlebaum*, 664 Fed. Appx. at 292 (holding subsection (b) "forbids a narrow category of unprotected speech—fighting words—and only when that speech occurs within hearing distance of a school or church," noting that "both the fighting-words requirement and the proximity limitation circumscribe" the discretion of the enforcing officers); *see also Kenny*, 885 F.3d at 290 (*Sarratt* clarifies that profane language alone cannot constitute a violation of the law . . . ."). Defendant further asserts that incident reports made part of the record "at least demonstrate disorderly conduct or disturbing the schools," and that "[i]f students are mischarged for protected speech, the issue is one of law enforcement, not the terms of the statutes or the Court's limitations to fighting words." ECF No. 230 at 5-6.

Plaintiffs respond that "[t]here is no dispute that only 'fighting words' may be subject to criminal prohibition or that South Carolina courts recognize this bedrock principle of constitutional law," but argue that the fighting words limitation is not dispositive of the vagueness question

because the Law is applied to school children to criminalize their use of obscene and profane language even in the absence of fighting words.  ECF No. 227 at 11-12.

The undisputed record demonstrates that in practice, Disorderly Conduct charges are not limited to only instances in which a student uses profanity *with* fighting words.  Captain Rinehart's testimony suggests that officers are not trained in such a narrow application of the Law, *see* ECF No. 223-13 at 5, 7, and S.P. serves as a specific example of a student whose disorderly conduct charge was based at least in part on use of profanity with no evidence of fighting words, *see* ECF No. 219.  Plaintiffs have additionally provided at least two incident reports that reflect disorderly conduct charges based on use of profanity with no accompanying fighting words.  ECF No. ECF 223-15; ECF 223-8.  Furthermore, the expert testimony shows that long lasting damage is associated with the charge itself, and that such damage is not necessarily mitigated by a subsequent dismissal or failure to convict.

As Plaintiffs have well shown, the Disorderly Conduct Law is vague because of "the intractability of identifying the applicable legal standard."  *Kolbe*, 849 F.3d at 149 (citing *United States v. Williams*, 553 U.S. 285, 306 (2008) ("What renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather the indeterminacy of precisely what that fact is"); and *Johnson*, 576 U.S. at 601 (emphasizing, in ruling that the residual clause of the Armed Career Criminal Act was unconstitutionally vague, the "pervasive disagreement about the nature of the inquiry one is supposed to conduct and the kinds of factors one is supposed to consider").  The Disorderly Conduct Law provides no discernable standard for applying and enforcing it to the State's elementary and secondary school students.  Furthermore, the undisputed record reflects that the lack of any such standard has resulted in a disproportionate number of students of color and students

living with a disability being charged under the Law. Accordingly, the court finds that the Law is

unconstitutionally vague on its face as applied to elementary and secondary school students in South

Carolina.

### III.     The Former Disturbing Schools Law

As enforced prior to the May 17, 2018 amendments, the Disturbing Schools Law provides

as follows:

> (A) It shall be unlawful:
> (1) for any person willfully or unnecessarily (a) to interfere with or to disturb in any
> way or in any place the students or teachers of any school or college in this State, (b)
> to loiter about such school or college premises or (c) to act in an obnoxious manner
> thereon; or
> (2) for any person to (a) enter upon any such school or college premises or (b) loiter
> around the premises, except on business, without the permission of the principal or
> president in charge.
> (B) Any person violating any of the provisions of this section shall be guilty of a
> misdemeanor and, on conviction thereof, shall pay a fine of not more than one
> thousand dollars or be imprisoned in the county jail for not more than ninety days.

S.C. Code § 16-17-420. The former Disturbing Schools Law was amended pursuant to Act 183,

2018 S.C. Acts, which states in relevant part:

> After the effective date of this act, all laws repealed or amended by this act must be
> taken and treated as remaining in full force and effect for the purpose of sustaining
> any pending or vested right, civil action, special proceeding, criminal prosecution, or
> appeal existing as of the effective date of this act, and for the enforcement of rights,
> duties, penalties, forfeitures, and liabilities as they stood under the repealed or
> amended laws.

Act 182, 2018 S.C. Acts. As mentioned, the Disturbing Schools Law in its current form applies

only to nonstudents. Plaintiffs raise no challenge to the Disturbing Schools Law in its current form.

### A.     Arguments

As with the Disorderly Conduct Law, Plaintiffs argue that the terms in subsection (1) to

"interfere with or to disturb in any way," to "loiter," and "to act in an obnoxious manner" render the

former Disturbing Schools Law unconstitutionally vague because the law provides no objective standard by which to measure what behavior is criminal and what is not.  ECF No. 216-1 at 33.

Defendant argues that the challenged terms are not impermissibly vague because they "are all limited by the requirement that a person engage in these acts 'willfully or unnecessarily,'" and are additionally limited to conduct that disrupts the learning environment, as construed by the South Carolina Supreme Court in *In re Amir X.S.*, 639 S.E.2d 144, 148-49 (S.C. 2006).  ECF No. 215-1 at 12.  Defendant asserts that the term "willfully" carries the same mens rea requirement as "knowingly," and that "unnecessary" is "a term of ordinary meaning that something is '[n]ot required under the circumstances; not necessary,'" and that these terms "provide[] additional indicia of objectivity." *Id.* at 14.   As to the specific terms "interfere with," "obnoxious," and "loiter," Defendant argues the conduct is prohibited only to the extent it is engaged in willfully or unnecessarily *and* is disruptive to the school environment, and that therefore the terms offer sufficient notice of what behavior may be criminalized.   *Id.* at 17-20; ECF No. 230.

Plaintiffs respond that "[t]he single use of the term 'disturb the learning environment' by the *Amir* court appears in the context of a discussion of the law's reach," and "was not intended to modify or clarify the actual terms of the law."  ECF No. 231 at 11.  Plaintiffs assert that the former Disturbing Schools Law was enforced "regardless of whether students or other students or faculty [were] present," and "without limitation to the times of day or year when school is in session."  *Id.* at 12 (citing 1994 S.C. Op. Att'y. Gen. 62, 1994 WL 199757; 1990 S.C. Op. Att'y. Gen. 175, 1990 WL 482448).  Plaintiffs further respond that the former Law contains no scienter requirement nor any other meaningful limitation that could mitigate its vagueness.  ECF No. 227 at 12.

B.     **Findings**

The plain language of the statute makes it unlawful to "interfere with or to disturb *in any way* or *in any place*" students or teachers, and separately, "to act in an obnoxious manner" on school grounds, "to loiter about" school grounds, and to "loiter about the premises" without express permission. S.C. Code Ann. § 16-17-420 (emphasis added).  The statute does not define the terms "interfere with," "disturb," "loiter," or "obnoxious manner."   In *Town of Honea Path*, the South Carolina Supreme Court interpreted the phrase "'interference' . . . 'in any manner'" and found that the term failed to provide clear notice and that it infringed upon protected First Amendment rights. 176 S.E.2d at 567.  Merriam-Webster defines "disturb" as "to interfere with," "to alter the position or arrangement of," "to destroy the tranquility or composure of," "to throw into disorder." Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/disturb (last visited September 23, 2021).  Merriam-Webster defines "obnoxious" as "odiously or disgustingly objectionable," "highly offensive," and "unpleasant in a way that makes people feel offended, annoyed, or disgusted."  Merriam-Webster Dictionary, available at https://www.merriam-webster.com/dictionary/obnoxious (last visited September 23, 2021).  Whether conduct meets the definition of these terms depends on the subjective viewpoint of the observer, particularly as it pertains to the behavior of school children.  As to the term loiter, an individual's "right to remove from one place to another according to inclination," is recognized as a protected "attribute of personal liberty."  *Morales*, 527 U.S. at 53.  As such, courts historically require anti-loitering laws to join the term "loiter" with "a second specific element of the crime."  *Id.* at 57-8.  Noting the definition of "unnecessary," the court does not agree with Defendant that such term provides a second element.  *Cf. id.* (noting that state courts had upheld ordinances that criminalized loitering "combined with some other overt act or evidence of criminal intent").

The statute's susceptibility to subjective assessment is in contrast with the ordinance at issue in *Grayned*, which case both parties cite to for support. The ordinance in *Grayned* was designed "for the protection of schools," and forbid "deliberately noisy or diversionary activity that disrupts or is about to disrupt normal school activities." *Grayned*, 408 U.S. at 110-11. In addition to describing the prohibited conduct, the ordinance set forth fixed times when the willful activity was forbidden—when school is in session—and set forth a "sufficiently fixed place," that is, "adjacent" to the school. *Id.* at 111. The Court noted that it "might be troubled by the imprecision" of the ordinance's provision, "tends to disturb," but had before it rulings by the state's Supreme Court containing constructions of similar ordinances, which allowed the Court to interpret "tends to disturb" as prohibiting "only actual or imminent interference with the peace or good order of the school." *Id.* at 111-12. The Court explained:

> [a]lthough the prohibited quantum of disturbance is not specified in the ordinance, it is apparent from the statute's announced purpose that the measure is whether normal school activity has been or is about to be disrupted. We do not have here a vague, general 'breach of the peace' ordinance, but a statute written specifically for the school context, where the prohibited disturbances are easily measured by their impact on the normal activities of the school. Given this particular context, the ordinance gives fair notice to those to whom (it) is directed.

*Id.* at 112 (citation and internal quotation marks omitted). The Court specified in its reasoning that the city did not "claim the broad power to punish all 'noises' and 'diversions,'" and rather had sufficiently dispelled the vagueness of those terms by including the requirements that (1) the "noise" or "diversion" be "actually incompatible with normal school activity"; (2) "there be a demonstrated causality between the disruption that occurs and the 'noise or diversion'"; and (3) "the acts be 'willfully' done." *Id.* at 113-14.

Unlike *Grayned*, the former Disturbing Schools Law does not require intent, demonstrated causation, or actual disruption of classes. 408 U.S. at 109. Defendant argues that the term

"willfully" creates an element of knowledge and thereby provides notice of the prohibited conduct. It is true that a scienter requirement "may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Village of Hoffman Estates*, 455 U.S. at 499.[10]  However, the term willful is used alternatively with the term "unnecessary"; therefore, a student could be held in violation of the statute having acted without knowledge or intent.  Additionally, the Office of the South Carolina Attorney General opined in 1990 that the Disturbing Schools Law "makes no reference to the time period for enforcement."  1990 S.C. Op. Att'y Gen. 175 (1990), No. 90, 1990 WL 482448.  The Opinion noted that "[t]he prohibitions against interfering with or disturbing students or teachers and acting in an obnoxious manner appear to be applicable only when a school is in session or otherwise open," but ultimately concluded that the statute presents no time restriction and, therefore, "could be enforced regardless of whether school is in session."  *Id.*  That Office later opined in 1994 that the former Disturbing Schools Law could "apply to any part of the campus regardless of whether students or other students [sic] or faculty were present."  1994 S.C. Op. Att'y Gen. 62 (1994), No. 25, 1994 WL 199757.  Guidance from that Office therefore reflects what the Fourth Circuit observed, which is that the former Law "applies to all people who in 'any way or in any place' willfully or unnecessarily disturb students or teachers of any school or college."  *Kenny*, 885 F.3d at 291.  Worse, it allows for the criminal prosecution of "just about any minor perceived infraction," without providing notice as to "the type of conduct that will lead to an arrest."  *Id.*

Defendant asserts that the South Carolina Supreme Court has narrowly construed the former Disturbing Schools Law to prohibit only behavior that "disturbs the learning environment."  ECF

---

[10] "Scienter" is defined as "[a] degree of knowledge that makes a person legally responsible for the consequences of his or her act or omission."  Black's Law Dictionary (10th ed. 2014).

No. 215-1 at 13-14 (citing *In re Amir*, 639 S.E.2d at 149, 150).  However, the *Amir* court expressly confined its holding to resolving the appellant's overbreadth challenge.  *In re Amir*, 639 S.E.2d at 149, 150 (explaining that because appellant lacked standing to challenge the Disturbing Schools Law on grounds of vagueness, the court would "not address the merits of his argument that the terms of § 16-17-420 are so vague that a person of common intelligence must necessarily guess at its meaning").  Indeed, the Fourth Circuit has already disagreed with Defendant that *Amir* is dispositive as to whether the former Disturbing Schools Law, as interpreted by the state court, infringes on Plaintiffs' rights to due process and free expression.  *Kenny*, 885 F.3d at 290.

Furthermore, even if *Amir* could be read as construing the former Disturbing Schools Law as Defendant suggests, such limitation fails to resolve the issue that the statute provides no standard for determining the sort of interference, disturbance, loitering, or obnoxious behavior that should give rise to a criminal charge.  *Cf. Goguen*, 415 U.S. at 578-79 (rejecting argument that "narrow subject matter of the statute" could resolve "the central vagueness question—the absence of any standard for defining contemptuous treatment").  Therefore, even if the court found in Defendant's favor on the scienter argument and applied the construction as discussed in *Amir*, Defendant has not overcome the clear absence of an objective standard necessary to distinguish between typical childhood and adolescent behavior and the sort of conduct that is criminally prohibited.  And, as with the Disorderly Conduct Law, the undisputed record reflects that the lack of any such standard has resulted in a disproportionate number of students of color and students living with a disability being charged under the former Law.  Accordingly, the court finds that the former Disturbing Schools Law is unconstitutionally vague on its face as applied to elementary and secondary school students in South Carolina.

As a final matter, the court notes Defendant's contention that, "[t]o take away the tools that law enforcement has and leave matters up to school disciplinary policy poses a risk to other students and school personnel."  ECF No. 226 at 6.  But Plaintiffs have demonstrated that these tools, insofar as Defendant refers to the challenged statutes, abridge the fundamental right held by our school-aged children to know what conduct is criminally prohibited.  These tools furthermore encourage if not cause arbitrary and discriminatory enforcement, as reflected by the undisputed record, because they provide law enforcement with no standard for application.  The record further demonstrates that the charge itself, even absent a conviction, carries long lasting and deleterious effects.  The State is capable of fashioning its law enforcement tools to address specifically for the school context what conduct it would criminalize and the standard by which the prohibition should be applied, and our Constitution requires no less.

**IT IS HEREBY ORDERED** that Plaintiffs Kenny and Nesmith are dismissed from this action; it is further

**ORDERED** that Defendant's Motion for Summary Judgment, ECF No. 215, is **DENIED** and Plaintiffs' Motion for Summary Judgment, ECF No. 216, is **GRANTED**; it is further

**ORDERED** that the State's enforcement of S.C. Code Ann. § 16-17-530 is permanently enjoined as to elementary and secondary school students in South Carolina while they are attending school; it is further

**ORDERED** that the State is permanently enjoined from retaining the records of the Disorderly Conduct Law Sub-Class and the Disturbing Schools Law Sub-Class, relating to being taken into custody, charges filed, adjudication, or disposition under S.C. Code Ann. § 16-17-420, prior to May 17, 2018, and under S.C. Code Ann. § 16-17-530, except as would be permissible following expungement under S.C. Code Ann. § 17-1-40; it is further

**ORDERED** that the court retains jurisdiction over this action for the purpose of addressing issues that should arise with respect to implementation of the Injunctions and to enforce the Injunctions.

**IT IS SO ORDERED.**

/s/Margaret B. Seymour
Margaret B. Seymour
Senior United Sates District Judge

October 8, 2021
Charleston, South Carolina